**Arnold B. ELKIND,**
**Plaintiff–Appellee–Cross–Appellant,**

v.

**LIGGETT & MYERS, INC.,**
**Defendant–Appellant–Cross–Appellee.**

**Nos. 811, 812, Dockets 79–7497, 79–7519.**

United States Court of Appeals,
Second Circuit.

Argued March 31, 1980.

Decided Dec. 4, 1980.

**158**

Robert N. Kaplan, New York City (Dale A. Schreiber, James B. Kilsheimer, III, Kaplan, Kilsheimer & Foley, New York City, of counsel), for Arnold B. Elkind.

Donald J. Cohn, New York City (C. Kenneth Shank, Jr., Alan Gabbay, Webster & Sheffield, New York City, of counsel), for Liggett & Myers, Inc.

Before MANSFIELD and NEWMAN, Circuit Judges.*

MANSFIELD, Circuit Judge:

This case presents a number of issues arising out of what has become a form of corporate brinkmanship—non--public disclosure of business—related information to financial analysts. The action is a class suit by Arnold B. Elkind on behalf of certain purchasers (more fully described below) of the stock of Liggett & Myers, Inc. (Liggett) against it. They seek damages for alleged failure of its officers to disclose certain material information with respect to its earnings and operations and for their alleged wrongful tipping of inside informa-

tion to certain persons who then sold Liggett shares on the open market.

After a non--jury trial Judge Constance Baker Motley held in post–trial findings and conclusions that Liggett did not violate Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), or Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, by failing prior to July 18, 1972, to release figures showing a substantial downturn in earnings or to correct erroneous projections of financial analysts which it had allegedly fostered. The court found, however, that on July 10, 1972, and July 17, 1972, officers of Liggett disclosed material inside information to individual financial analysts, leading to sale of Liggett stock by investors to whom this information was conveyed. Damages were computed on the basis of the difference between the price which members of the plaintiff class (uninformed buyers of Liggett stock between the time of the first tip and subsequent public disclosure) paid and what the stock sold for after the later disclosure. See 472 F.Supp. 123 (S.D.N.Y.1978). We affirm the dismissal of the counts alleging failure to disclose or correct. We reverse the finding of liability based on the alleged July 10, 1972, tip for want of materiality and scienter. We remand the determination of liability based on the July 17, 1972, tip for determination of damages. In all other respects the judgment is affirmed.

The plaintiffs consist of two classes: (1) with respect to Count I, which alleges misleading statements, nondisclosure of material information and failure to correct analysts' projections, all purchasers of Liggett stock between June 19, 1972, and July 18, 1972; (2) with respect to Count II, which alleges unlawful trading on the basis of tipped inside information, all purchasers of Liggett stock between June 28, 1972, and July 18, 1972. See 66 F.R.D. 36 (S.D.N.Y. 1975); 77 F.R.D. 708 (S.D.N.Y.1977).

Liggett is a diversified company, with traditional business in the tobacco industry

---

* Pursuant to § 0.14 of the Rules of this Court, this appeal is being determined by Judges Mansfield and Newman, who are in agreement on this opinion.

supplemented by acquisitions in such industries as liquor (Paddington Corp., importer of J&B Scotch), pet food (Allen Products Co. and Perk Foods Co., manufacturer of Alpo dog food), cereal, watchbands, cleansers and rugs. Its common stock is listed on the New York Stock Exchange.

In 1969 Liggett officers concluded that the company's stock was underpriced, due in part to lack of appreciation in the financial community for the breadth of its market activity. To cure this perceived deficiency, Liggett initiated an "analyst program," hiring a public relations firm and encouraging closer contact between analysts and company management. This included meetings with analysts at which Liggett officials discussed operations. Liggett also reviewed and commented on· reports which the analysts were preparing, to correct errors and other misunderstandings.

Liggett had a record year in 1971, with earnings of $4.22 per share (up from $3.56 in 1970). The first quarter of 1972 was equally auspicious. On March 22, Liggett issued a press release reporting that sales of the non–tobacco lines had continued to increase in the first two months, but noting that current stockpiling of J&B Scotch by customers (in anticipation of a price increase) could affect sales. On May 3, 1972, the company released its first quarter figures, showing earnings of $1.00 per share (compared to $.81 in the first quarter of 1971).

This quarterly operations report led to considerable optimism in the financial community over Liggett's prospects. Management did nothing to deflate the enthusiasm. A number of reports containing predictions that 1972 earnings would increase about 10% over 1971 earnings were reviewed by officials of Liggett during the first five months of 1972. While company personnel corrected factual errors in these reports, they did not comment (or made noncommittal or evasive comments) on the earnings projections, according to the findings below, which are supporterd by the record. At group meetings with analysts in February and March, management indicated that it was making "good progress" with certain products and that it was "well–positioned" to take advantage of industry trends. At the end of March, Liggett successfully made a public offering of $50 million of debentures. At an April 25 stockholders' meeting, Liggett's Executive Vice President expressed general optimism that the company was continuing to make good progress. On May 3, the first quarter earnings were released. At a May 16 meeting with analysts in New York, officials reiterated their vague but quieting pronouncements.[1] Similar comments, to the effect

---

[1]. Since, as the chronology below will indicate, this meeting took place one day after Liggett management became aware that the month of April had been a bad one for the company, the remarks made at the meeting merit scrutiny. The Director of Corporate Marketing, Samuel White, and the president of the Cigarette and Tobacco Division, Kenneth McAllister, each gave a speech focusing on the first quarter performance.

White discussed market trends, commenting on Liggett's position in light of those trends. He began,

"As you know, our non–tobacco operations have been successful, and all of our diversified consumer product lines had sales increases in the first quarter."

With respect to the liquor industry, he said,

"The increase in sales of our alcoholic beverages (particularly J&B Scotch) was unusually high in the first quarter, due to anticipated increases in imported liquor prices....

We expect J&B to continue to solidify its position as the number one Scotch in 1972, but it is difficult to say how the stock piling in the last three quarters might affect sales the rest of the year, as the Scotch market continues to grow."

He expressed hope for future improvement in the pet food line, and concern over weak performance of the company's carpet subsidiary, saying,

"we cannot predict how Mercury will do for the rest of the year, but over the long term, Mercury has good potential, as the carpet industry is expected to resume the growth trend of the 60's, based on a sharp increase in housing starts last year...."

Finally, he summarized:

"We are optimistic that most of our divisions will continue to make good progress. They are well–positioned in their respective industries, are growing, and can be expected to contribute significantly to our future growth."

that 1972 was expected to be a "good year," were voiced at a June 5 presentation in London.[2]

Despite the company's outward appearance of strength, Liggett's management was less sanguine intramurally. Internal budget projections called for only a two percent increase in earnings in 1972.[3] In April and May, a full compilation of updated figures was ordered, and new projections were presented to the Board of Directors on May 15. April was marked by a sharp decline, with earnings of only $.03 per share (compared to $.30 the previous April).[4] The 1972 earnings projection was revised downward from $4.30 to $3.95 per share. May earnings, which the Board received on June 19, rebounded somewhat to $.23 per share (compared to $.27 in May 1971 and original budget projections of $.34). At meetings with analysts during this period, Liggett officials took a more negative tone, emphasizing, for example, various cost pressures. There was no public disclosure of the adverse financial developments at this time. Beginning in late June, 1972, the price of Liggett's common stock steadily declined.

On July 17, preliminary earnings data for June and six-month totals became available to the Board of Directors. June earnings were $.20 per share (compared to $.44 in June 1971). The first half earnings for 1972 were approximately $1.46 per share, down from $1.82 the previous year. The Board decided to issue a press release the following day. That release, issued at about 2:15 P.M. on July 18, disclosed the preliminary earnings figures and attributed the decline to shortcomings in all of Liggett's product lines.

The district court found two "tips" of material inside information in the days before the July 18 press release. On July 10, analyst Peter Barry of Kuhn Loeb & Co. spoke by telephone with Daniel Provost, Liggett's Director of Corporate Communications. According to Barry's deposition testimony, apparently adopted by the court below, Provost confirmed Barry's suggestions that J&B sales were slowing due to earlier stockpiling and that a new competing dog food was affecting Alpo sales adversely. Barry asked if a projection of a 10% earnings decline would be realistic, and

McAllister spoke of the tobacco industry, explaining that operations had been disappointing during the last year, and that "we can not realistically look for anything better than moderate improvement for the year 1972."

2. At the London meeting, Samuel White made remarks substantially the same as his remarks at the May 16 meeting in New York, emphasizing market trends and making no specific or implied representations about short–term performance of Liggett, except as to first quarter figures. McAllister repeated his comments from the previous meeting as well.
Chief financial officer Ralph Moore discussed the performance of its stock and its bond issuance, then added:
"As you know, Gentlemen, the practice of making sales and earnings forecasts is somewhat more prevalent in the U.K. than in the United States. Liggett & Myers has traditionally been conservative in this respect and we refrain from making sales and earnings predictions. However, we expect another good year in 1972, and we expect to continue to make good progress thereafter."
Plaintiff contends that this representation that the company expected "another good year" in 1972 was tantamount to predicting a significant increase in earnings, despite the fact that, as will be seen below, the company had

by then become aware that the month of April had been a bad one (although the first quarter had been very good) and that the internal budget prediction of earnings had been lowered to $3.95 per share for 1972.

3. This is not necessarily incompatible with the more optimistic projections of outside analysts, even assuming that Liggett had a duty to correct those projections if it believed them to be erroneous. Sound budgeting procedures call for conservatism in making projections, a conservatism which may be undesirable in projections to be used in making investment decisions. In addition, the favorable first quarter, which far outstripped budget projections (anticipating a 20% decline in the first half), could well have led the company officials to forgo reliance on those figures in their dealings with analysts.
The record does not lead to the conclusion that there were facts underlying the relatively pessimistic budget figures which were contrary to statements made to outside analysts or which rendered those statements misleading.

4. The total earnings per share for the four months through April, 1972, were $1.03, compared to $1.11 for the first four months of 1971.

received what he characterized as a non-committal response. Barry testified that Provost told him that a preliminary earnings statement would be coming out in a week or so.[5] Since Barry knew of no prior instances in which Liggett had issued such a preliminary statement, he deduced that the figures would be lower than expected. Barry sent a wire, reprinted in the margin, to Kuhn Loeb's offices.[6] The information was conveyed to three clients. Two of them, holders of a total of over 600,000 shares did not sell. A third client sold the 100 shares he owned. No other Kuhn Loeb customers sold between the time of the July 10 "tip" and the release of preliminary earnings figures on July 18; Kuhn Loeb customers bought some 5,000 shares during this period.

The second "tip" occurred on July 17, one day before the preliminary earnings figures for the first half were released. Analyst Robert Cummins of Loeb Rhoades & Co. questioned Ralph Moore, Liggett's chief financial officer, about the recent decline in price of Liggett's common stock, as well as performance of the various subsidiaries. According to Cummins' deposition, he asked Moore whether there was a good possibility that earnings would be down, and received an affirmative ("grudging") response. Moore added that this information was confidential. Cummins sent a wire to his firm,[7] and spoke with a stockholder who promptly sold 1,800 shares of Liggett stock on behalf of his customers.

The district court held that each of these disclosures was a tip of material information in violation of Rule 10b–5, rendering Liggett liable to all persons who bought the company's stock during the period from July 11 to July 18, 1972, inclusive, without

5. It is difficult to reconcile this testimony with undisputed evidence, accepted by the court below, that the June figures were not computed until the following week and that the decision to issue a press release was not made until July 17. 472 F.Supp. at 125.

6. This wire stated:
"RE: *Liggett & Myers*. The company is expected to report preliminary second quarter results sometime this week. We believe that earnings will be down year–to–year by perhaps as much as 10% from the $1.00 a share posted during last year's June quarter.
"Second quarter J&B Scotch sales were probably penalized by advanced buying in the first quarter prompted by a price increase initiated April 1, 1972. Alpo dog food sales were likely impacted temporarily by the national introduction of Campbell Soup's 'Recipe' brand dog food, which has reportedly carved a $30 million niche in the canned dog food market. Furthermore, Liggett & Myers' recently–acquired Mercury Mills carpet operation is thought to be laboring under pressures born of the Federal Trade Commission's more strict flammability standards, which may have required considerable product recall. Some time may elapse before sales momentum can be re–established.
"We think it prudent at this juncture to 'pare our primary earnings estimate of $4.60 a share, expecting Liggett & Myers will earn between $4.40–$4.50 a share during calendar 1972 and tentatively forecast an earnings level of $4.85 for 1973, assuming no lingering after effects in either the pet food or carpeting divisions.

"While this stock's price may weaken when earnings are reported, we remain confident of the company's long–range earning power and would counsel investors willing to look through this potentially turbulent period *retain* their L & M holding or take advantage of *a depressed price to add or to establish positions*." (Emphasis in original).

7. This wire, headed "for internal use only," stated:
"Persistent weakness in the stock appears to be due to the expectation of disappointing second quarter earnings, for the reasons discussed in our Investment Committee Notes of May 8, 1972, including comparison with an excellent quarter last year, liquor–inventory stockpiling by distributors in this year's first quarter, and lower profit margins (despite high sales) in the pet food division. In addition there have been unexpected problems at Mercury Mills, a small rug company acquired last year. While management declines to comment specifically prior to release of the figures about the first week in August, it now appears that second quarter earnings may have been lower than last year's, and this suggests that the first half may have been flat at best. We still think the year as a whole should show some improvement over last year's $4.22 a share, but we now have considerably less confidence in our previous $4.65 estimate. We continue to believe that Liggett can continue the earnings growth trend established in recent years, and feel that the shares at this price may be held, but we would not be an aggressive buyer yet."

knowledge of the tipped information. However, the court rejected plaintiff's claims that Liggett was under a legal obligation to correct the analysts' earlier erroneous predictions, relying on this court's decision in *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937 (2d Cir. 1969). It also rejected plaintiff's claims that Liggett's earlier statements to analysts and stockholders were misrepresentations and that Liggett was under a duty to issue a preliminary earnings statement in June when it received its May figures.

In computing damages for the July 10 and 17 tips, the court attempted to award the difference between the amount plaintiff class members paid for their stock and the value they received. The latter was interpreted to be the price at which the stock would have sold had there been public disclosure of the tipped information. The court ruled that plaintiff's expert testimony on this point was speculative and unsupported by the record. Instead, following *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90 (10th Cir.), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971), it looked to the actual market price at the end of "a reasonable period" (eight trading days) following the July 18 release of earnings figures as an approximation of what the price would have been had the tipped information been disclosed publicly. Thus damages amounted to the difference between the plaintiff class members' purchase prices (generally in the vicinity of $60 per share) and $43, the price of the stock eight trading days after disclosure. Based on the total volume of trading transactions from July 11 to July 18, the court awarded damages amounting to $740,000 on condition that any unclaimed portion would revert to Liggett. To this the court added prejudgment interest of approximately $300,000.

Liggett now appeals from the finding of liability on the tipping count, the computation of damages and the award of prejudgment interest. Plaintiff Elkind appeals from the dismissal of his count alleging 10b–5 violations based on Liggett's failure to correct the analysts' high 1972 earnings projections and its alleged false and misleading statements to the investment community.

## DISCUSSION

The issues before us on this appeal are (1) whether Liggett, by virtue of its alleged cultivation of favorable reports and forecasts by analysts, incurred an obligation to disclose its less optimistic internal predictions; (2) whether Liggett made false and misleading statements in violation of Rule 10b–5; (3) whether the private disclosures of July 10 and 17 amounted to tips forbidden by the rule; and (4) if so, whether damages were properly assessed.

### 1. *Obligation to Disclose*

Plaintiff asserts that Liggett's practice of reviewing and correcting draft reports regarding the company's operations gave rise to a duty to disclose that its own internal forecasts were less exuberant, and to "correct" the investment community's expectations. The district court held itself bound to reject this claim by *Electronic Specialty Co. v. International Controls Corp., supra.* In that case, arising under § 14(e) of the 1934 Act (as amended in 1968) the plaintiff argued that the defendant, which was preparing to make a tender offer, was under a duty to correct erroneous factual statements in a Wall Street Journal column of which it may have had knowledge but was not the source. We ruled that "[w]hile a company may choose to correct a misstatement in the press not attributable to it, . . . we find nothing in the securities legislation requiring it to do so." 409 F.2d at 949 (citation omitted).[8]

---

**8.** See also *In re Commonwealth Oil/Tesoro Petroleum Corp. Securities Litigation*, 467 F.Supp. 227, 239–40 (W.D.Tex.1979); *Zucker v. Sable*, 426 F.Supp. 658, 662–63 (S.D.N.Y.1976); *Hutto v. Texas Income Properties Corp.*, 416 F.Supp. 478, 482 (S.D.Tex.1976); *Milberg v. Western Pacific R. R.*, 51 F.R.D. 280, 282 (S.D.N.Y. 1970), *appeal dismissed*, 443 F.2d 1301 (2d Cir. 1971).

A duty to correct statements of outsiders which are not attributable to the company may, of course, be imposed by other sources. See, e.

While we readily agree that *Electronic Specialty* is the law of this circuit and that its rule is equally applicable in a suit relying on § 10(b) and Rule 10b–5,[9] the controversy before us is whether Liggett sufficiently entangled itself with the analysts' forecasts to render those predictions "attributable to it," thus removing it from the conduct held protected in *Electronic Specialty*. We have no doubt that a company may so involve itself in the preparation of reports and projections by outsiders as to assume a duty to correct material errors in those projections. This may occur when officials of the company have, by their activity, made an implied representation that the information they have reviewed is true or at least in accordance with the company's views. Cf. *Kerbs v. Fall River Industries, Inc.*, 502 F.2d 731, 739–40 (10th Cir. 1974); *Green v. Jonhop*, 358 F.Supp. 413, 418–20 (D.Or.1973); *Moerman v. Zipco, Inc.*, 302 F.Supp. 439, 446 (E.D.N.Y.1969), *affd. per curiam*, 422 F.2d 871 (2d Cir. 1970).

After reviewing the facts of this case, however, we find no reason to reverse as clearly erroneous the district court's finding that Liggett did not place its imprimatur, expressly or impliedly, on the analysts' projections. The company did examine and comment on a number of reports, but its policy was to refrain from comment on earnings forecasts. Testimony at trial indicated that the analysts knew they were not being made privy to the company's internal projections.[10] While the evidence leaves little doubt that Liggett made suggestions as to factual and descriptive matters in a number of the reports it reviewed, the record does not compel the conclusion that this conduct carried a suggestion that the analysts' projections were consistent with Liggett's internal estimates. Nor has plaintiff demonstrated that Liggett left uncorrected any *factual* statements which it knew or believed to be erroneous.[11] Thus, Liggett assumed no duty to disclose its own forecasts or to warn the analysts (and the public) that their optimistic view was not shared by the company.

While we find no liability for non–disclosure in this aspect of the present case, it bears noting that corporate pre–release review of the reports of analysts is a risky activity, fraught with danger. Management must navigate carefully between the "Scylla" of misleading stockholders and the public by implied approval of reviewed analyses and the "Charybdis" of tipping material inside information by correcting statements which it knows to be erroneous. A company which undertakes to correct errors in reports presented to it for review may find itself forced to choose between raising no objection to a statement which, because it is contradicted by internal information, may be misleading and making that information public at a time when corporate interests would best be served by confidentiality. Management thus risks sacri-

g., N.Y.Stock Exchange Company Manual A–23 (1979); American Stock Exchange Company Guide § 402(3) (1973); *Intercontinental Industries, Inc. v. American Stock Exchange*, 452 F.2d 935 (5th Cir. 1971), *cert. denied*, 409 U.S. 842, 93 S.Ct. 41, 34 L.Ed.2d 81 (1972).

9. See *Electronic Specialty, supra*, 409 F.2d at 940–41, 945 & n. 6 (reading § 14(e) as enactment of Rule 10b–5 applied to parties to tender offer); *Chris–Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 362 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973); *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 605 (5th Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974).

10. For example, analyst Arthur Baer, Jr., of Baker Weeks & Co., a witness for the plaintiff, testified, "Analysts are not told about internal figures," in describing Liggett's analyst program.

11. A number of commentators have suggested, contrary to *Electronic Specialty*, the existence of a corporate duty under certain circumstances to correct erroneous information in the marketplace even though the corporation was not the source of that information and has not created the appearance of confirming its accuracy. See, e. g., 5A Jacobs, The Impact of Rule 10b–5, § 88.04[b] (1980); Dayan, *Correcting Errors in the Press*, 5 Rev.Sec.Reg. 941, 941–45 (1972); Shade, *Duties of Publicly Held Corporations Under the Federal Securities Laws*, 26 Bus.Law. 497, 504 (1970). None of these writers, however, goes so far as to suggest a duty to "correct" *projections* which differ substantially from the company's internal projections.

ficing a measure of its autonomy by engaging in this type of program. Since Liggett had not undertaken to pass on earnings forecasts, however, it did not violate any duty to correct these figures.

2. *Alleged False and Misleading Statements*

Plaintiff's second argument on appeal is that Liggett's officers intentionally engaged in misleading behavior by their repeated assertions that 1972 was expected to be a good year, knowing that the listening analysts might understand this to confirm their predictions of a 10% increase in earnings, when in fact Liggett expected a less bountiful harvest and had figures showing that the company had fared poorly in April. The district court found this claim to be substantially a restatement of the "duty to disclose" claim which it had rejected, and held that "plaintiff has failed to prove that Liggett made misrepresentations about its financial condition." 472 F.Supp. at 126–27.

■ The record, particularly the passage quoted in note 2, *supra*, raises the possibility that management was indulging in Delphic pronouncements intended to give the false impression that all was well without stating any untrue facts. The misleading character of a statement is not changed by its vagueness or ambiguity. Liability may follow where management intentionally fosters a mistaken belief concerning a material fact, such as its evaluation of the company's progress and earnings prospects in the current year.[12]

■ In the present case, the disputed question is whether the statements of Liggett officials to the analyst groups carried an implication that the company viewed the forecasts of the analysts as attainable. If so, the management's statements were material, and (if accompanied by scienter) they were certainly improper. If false, they were deceptive and misleading; if true, they may have constituted non–public disclosure of inside information. In determining how these undisputed statements were intended and likely to be taken by the assembled listeners, we must accord considerable deference to the trial judge, who heard testimony from both the management speakers and those who heard them, as well as from expert witnesses.[13] Evaluation of the context of the statements, the atmosphere of the meetings and standard practices in meetings of this sort, all relevant in this inquiry, is primarily the responsibility of the trier of fact. We cannot conclude as a matter of law that comments such as "we expect another good year in 1972" were likely to confirm the optimistic projections then in circulation or to lead the sophisticated and experienced listeners astray, compare *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 16 (2d Cir. 1977), or that they misrepresented the views of management at the time. We therefore affirm the dismissal of plaintiff's claim alleging misleading conduct.

**12.** The materiality of management's views concerning these matters is beyond doubt. See *Marx v. Computer Sciences Corp.*, 507 F.2d 485, 489 (9th Cir. 1974); *REA Express, Inc. v. Interway Corp.*, 410 F.Supp. 192, 197–98 (S.D. N.Y.), *rev'd on other grounds*, 538 F.2d 953 (2d Cir. 1976); Report of the Advisory Committee on Corporate Disclosure to the SEC 55 (1977); Kripke, *A Search for a Meaningful Securities Disclosure Policy*, 31 Bus.Law. 293, 298 (1975).

**13.** Among the strongest pieces of evidence in support of plaintiff's claim were the notes of a Liggett employee, taken at a meeting between analysts and company officials around the beginning of March, 1972, which read:

"The ten percent earnings increase for the corporation which is being given by responsible organizations in the street now, that is

$4.60 for 1972, is possible and at this point we see no reason why this cannot be done." This, of course, is damaging to Liggett's claim that it adhered to a policy of declining to comment on earnings projections. Nevertheless, there was other evidence entitling the district judge to conclude that this uncharacteristic comment did not create an expectation that Liggett would update its views on the estimates of outside analysts.

Assuming that the statement was true when made (which seems likely, after the successful months of January and February), it may in addition have constituted an impermissible tip of inside information. Since plaintiffs do not allege harm from this particular tip, we need not consider whether it amounted to a violation of Rule 10b–5.

### 3. Tipping Liability

The knowing use by corporate insiders of non–public information for their own benefit or that of "tippees" by trading in corporate securities amounts to a violation of Rule 10b–5, *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *In re Cady, Roberts & Co.*, 40 S.E.C. 907 (1961), which may give rise to a suit for damages by uninformed outsiders who trade during a period of tippee trading. *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith*, 495 F.2d 228 (2d Cir. 1974). See *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980).[14]

■ The duty imposed on a company and its officers is an alternative one: they must disclose material inside information either to no outsiders or to all outsiders equally. As with any claim under Rule 10b–5, scienter must be proven. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). However, if there is no trading by tippees (or those to whom the tippees convey their information), there can be no damages for tipping under § 10(b). See *Shapiro v Merrill Lynch, Pierce, Fenner & Smith*, 353 F.Supp. 264, 278 (S.D.N.Y. 1972), *affd.*, 495 F.2d 228 (2d Cir. 1974). Trades by tippees are attributed to the tipper. Cf. *Mosser v. Darrow*, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951); *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1308 (2d Cir.), *cert. denied*, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971). Tippee trading, therefore, is the primary and essential element of the offense. The investor otherwise has no right to confidential undisclosed data from the company's files even though it might, if disclosed, influence his investment decision.[15]

The corporate officer dealing with financial analysts inevitably finds himself in a precarious position, which we have analogized to "a fencing match conducted on a tightrope." *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 9 (2d Cir. 1977). A skilled analyst with knowledge of the company and the industry may piece seemingly inconsequential data together with public information into a mosaic which reveals material non–public information.[16] Whenever managers and analysts meet elsewhere than in public, there is a risk that the analysts will emerge with knowledge of material information which is not publicly available.

Despite the risks attendant upon these contacts,[17] the SEC and the stock exchanges as well as some commentators have taken the view that meetings and discussions with analysts serve an important function in collecting, evaluating and disseminating corporate information for public use.[18] The rec-

---

**14.** The Supreme Court ruled in *Chiarella* that there can be no violation of § 10(b) unless the party so charged has violated a duty arising out of a relationship of trust. A corporate insider who tips confidential information clearly violates a fiduciary obligation, see *Chiarella, supra*, 445 U.S. at 229 & n. 12, 100 S.Ct. at 1115 & n. 12. This obligation is breached by insider selling, e. g., *Shapiro, supra*; cf. *Gratz v. Claughton*, 187 F.2d 46, 49 (2d Cir.) (L. Hand, J.), *cert. denied*, 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951), as well as buying, e. g., *SEC v. Texas Gulf Sulphur Co., supra*.

**15.** Whether the SEC may seek injunctive relief against tipping which has not been shown to have resulted in tippee trading is an issue not before us, and we do not wish our formulation of the duty involved to be taken to imply a view. See *Faberge, Inc.*, Exch.Act Rel. No. 10174, [1973 Transfer Binder] Fed.Sec.L.Rep. (CCH) Par. 79,378, at 83,105–06 (1973); *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, Exch.Act Rel. No. 8459 [1967–69 Transfer Binder] Fed. Sec.L.Rep. (CCH) Par. 77,629 (1968).

**16.** See Parker, *Ethical Issues for the Financial Analyst*, in Corporate Financial Reporting: Ethical and Other Problems 165, 167 (1972).

**17.** See, e. g., Address of Chairman Manuel F. Cohen, Baltimore Securities Analysts Society, Jan. 6, 1969, reprinted in [1967–69 Transfer Binder] Fed.Sec.L.Rep. (CCH) Par. 77,652.

**18.** See, e. g., *Matter of Investors Mgmt. Co.*, Exch.Act Rel. No. 9267 [1970–71 Transfer Binder] Fed.Sec.L.Rep. (CCH) Par. 78,163, at 80,521 (1971); American Stock Exchange Company Guide §§ 401–06 (1973); Feuerstein, *The Corporation's Obligations of Disclosure Under the Federal Securities Laws When It Is Not Trading in Its Stock*, 15 N.Y.L.F. 385, 397–98 (1969); Address of Phillip A. Loomis, Jr., Financial Analysts Federation, Oct. 7, 1968, summarized in [1967–69 Transfer Binder] Fed.Sec.L.Rep.

onciliation of this outlook with the SEC's mandate that material facts may be disclosed to investors, provided they are made available to all (through filings with the SEC) and not merely to analysts,[19] has led to a case–by–case approach. *SEC v. Bausch & Lomb, Inc., supra*, 565 F.2d at 10.

The prerequisites of tipping liability, in addition to the revelation of non–public information about a company to someone who then takes advantage of this superior knowledge by trading in the company's stock, are that the tipped information must be *material,* and that the tipper–defendant must have acted with *scienter.*

■ (a) *Materiality.* We discussed the meaning of "materiality" in the *Bausch & Lomb* case, *supra*, reiterating the language of *Texas Gulf Sulphur* that the disclosed information must be "reasonably certain to have a substantial effect on the market price of the security." 565 F.2d at 15. We further applied the Supreme Court's definition of materiality from *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976):

> "What the standard [of materiality] does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."

Thus a relevant question in determining materiality in a case of alleged tipping to analysts is whether the tipped information, if divulged to the public, would have been likely to affect the decision of potential buyers and sellers.

Viewed under this standard, we cannot agree that the July 10 "tip" was material. The disclosure in that conversation consisted of confirmation that J&B sales were slowing due to earlier stockpiling and that Alpo sales were being adversely affected by Campbell's competing product and by the information that a preliminary earnings statement would be coming out in a week. The "news" about J&B and Alpo was already common knowledge among the analysts–indeed, Liggett had publicly stated that a decline in J&B sales was expected. The confirmation of these facts, which were fairly obvious to all who followed the stock and were not accompanied by any quantification of the downturns, cannot be deemed "reasonably certain to have a substantial effect on the market price of the security." Similarly, we cannot agree that in this context the bare announcement that preliminary earnings would be released in a week was material. No information concerning the amount of those earnings was disclosed, and the mere fact that there would be a release added little to the already available wisdom of the market place (reflected by stock prices which had been falling for two weeks) that Liggett might be in a downturn. It would serve little purpose to require a corporation to call a press conference in order to announce that it would be making an announcement in another week.

■ Further indication of the lack of materiality may be found in the reaction of those who were exposed to the inside information. See *Lilly v. State Teachers Retirement System*, 608 F.2d 55, 58 (2d Cir. 1979), *cert. denied,* 446 U.S. 939, 100 S.Ct. 2159, 64 L.Ed.2d 792 (1980); *SEC v. Shapiro*, 494 F.2d 1301, 1307 (2d Cir. 1974). The institutional investors, holders of 600,000 shares of Liggett, did not sell any of them. Indeed, the wire sent out by analyst Barry, note 6, *supra*, was equivocal in its drawing of adverse inferences. The sale of 100 shares by one stockholder, who may have been influenced by public information rather than the tipped information in the wire, does little to

---

(CCH) Par. 77,624, at 83,338, and excerpted in *SEC v. Bausch & Lomb, Inc.*, 420 F.Supp. 1226, 1231 n. 1 (S.D.N.Y.1976), *affd.*, 565 F.2d 8 (2d Cir. 1977).

**19.** See Securities Act Rel. No. 5699 [1975–76 Transfer Binder] Fed.Sec.L.Rep. (CCH) Par. 80,461, at 86,202–03 (1976).

offset the indication that the tip was not one of material information.

The July 17 tip, however, was sufficiently directed to the matter of earnings to sustain the district court's finding of materiality. According to the deposition of Robert Cummins, the tippee, he inquired whether there was a "possibility" that earnings for the second quarter would be down, and received an affirmative response. He then inquired whether this was a "good possibility," and was again told yes. He was asked to keep the information confidential. Cummins then sent off a wire, note 7, *supra*, stating that second quarter earnings, and probably first half earnings as well, would be lower than the previous year's totals.

While there is considerable room for doubt concerning the materiality of this disclosure, particularly in view of the lack of specificity and the fact that Cummins' wire was substantially the same as the wire sent by Barry after receiving information which we have concluded was not material, there are sufficient indicia of materiality to support the district court's conclusion. The request by Moore (Liggett's chief financial officer) that Cummins not repeat what he had been told added to the impression that the earnings were worse than those following the stock expected them to be. Moreover, 1,800 shares were sold by a stockbroker on behalf of his customers, after speaking with Cummins by telephone. The stockbroker was left with the impression that "the second quarter was going to be very poor," which he considered significant enough to prompt the sale. We therefore conclude that the July 17 tip was one of material inside information.

(b) *Scienter.* The Supreme Court, in *Ernst & Ernst v. Hochfelder, supra*, ruled that scienter is an essential element of a § 10(b) violation, leaving to the lower courts the meaning of scienter in various contexts.[20] In this case we must apply the scienter requirement to the alleged tipping of material inside information. The district court did not discuss or apply this requirement. The only relevant discussion below was a finding, made in the context of assessing damages, that Liggett gave inside tips to analysts in order "to cultivate good relationships with selected financial analysts who followed Liggett," hoping to save the analysts from being taken by surprise and embarrassed before their customers. 472 F.Supp. at 134. While this is not the only possible explanation of Liggett's disclosures, it is supported by the evidence, and therefore we accept it. Issues of purpose and motivation are best left to the court which hears the testimony of the actors.

■ The Supreme Court defined scienter as "knowing or intentional misconduct," 425 U.S. at 197, 96 S.Ct. at 1382, leaving open the possibility that recklessness might suffice, *id.* at 193 n. 12, 96 S.Ct. at 1380 n. 12. We need go no further than the term "knowing" to resolve this case. One who deliberately tips information which he knows to be material and non-public[21] to an outsider who may reasonably be expected to use it to his advantage has the requisite scienter.[22] This action amounts to knowing misconduct. One who intentionally places such ammunition in the hands of individuals able to use it to their advantage on the market has the requisite state of mind for liability under § 10(b) and Rule 10b–5.

Applying this standard to the present case, we conclude that the July 10 tip was not accompanied by scienter. There is no evidence to indicate that when Liggett's Provost acknowledged what was commonly

**20.** E. g., *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 44–47 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *Sanders v. John Nuveen & Co.,* 554 F.2d 790, 792–93 (7th Cir. 1977).

**21.** But see *In re Cady, Roberts & Co.,* 40 S.E.C. 907, 912 n. 17 (1961); Comment, *Deterrence of Tippee Trading Under Rule 10b–5,* 38 U.Chi.L.

Rev. 372, 383–84 (1971) (knowledge of non-public nature not required).

**22.** We need not determine whether recklessness as to the materiality or non–public nature of the information would suffice, since the evidence in this case demonstrates knowledge as to the July 17 tip.

known by the analysts and mentioned that preliminary earnings would be released in a week, he believed that he was disclosing information that would be of significance in any analyst's or investor's assessment of Liggett stock, much less used for any trading advantage. The evidence most favorable to plaintiff, i. e., analyst Barry's testimony, indicates that Barry attributed significance to the tip concerning the release of earnings only by virtue of his belief that this was unprecedented, from which he deduced that the earnings would probably be below expectations. Absent evidence from which it may be inferred that the tipper knows or should certainly appreciate that the disclosure could reasonably be expected to be used by the tippee to his advantage, the essential state of mind for 10b–5 liability is lacking.

There was ample evidence of scienter in connection with the July 17 tip. One could reasonably infer that an official commenting on earnings shortly before their public release will know that the tip could reasonably be expected to be used by the tippee for trading advantages. It is therefore material. Indeed, Moore's request that the disclosure be kept confidential strongly supports this inference. The district court's finding that the information was disclosed in order to keep the analysts (whose job it was to advise clients in their trading of stock) a step ahead of public knowledge supports this conclusion.

We therefore conclude that the tip of July 10 was not material and was not accompanied by the requisite scienter to furnish the basis for liability under Rule 10b–5. The tip of July 17, however, was material and made with scienter. We turn, then, to the computation of damages.

## 4. Damages

This case presents a question of measurement of damages which we have previously deferred, believing that damages are best addressed in a concrete setting. See *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra*, 495 F.2d at 241–42; *Heit v. Weitzen*, 402 F.2d 909, 917 & n. 8 (2d Cir. 1968), *cert. denied*, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969). We ruled in *Shapiro* that defendants selling on inside information would be liable to those who bought on the open market and sustained "substantial losses" during the period of insider trading.[23]

█ The district court looked to the measure of damages used in cases where a buyer was induced to purchase a company's stock by materially misleading statements or omissions. In such cases of fraud by a fiduciary intended to induce others to buy or sell stock the accepted measure of damages is the "out–of–pocket" measure.[24] This consists of the difference between the price paid and the "value" of the stock when brought (or when the buyer committed himself to buy, if earlier).[25] Except in

**23.** The Sixth Circuit has since reached the opposite conclusion. *Fridrich v. Bradford*, 542 F.2d 307, 318 (6th Cir. 1976), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 769 (1977).

**24.** *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 711 (1972); *Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir. 1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *Fershtman v. Schectman*, 450 F.2d 1357, 1361 (2d Cir. 1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972); Note, *The Measurement of Damages in Rule 10b–5 Cases Involving Actively Traded Securities*, 26 Stan.L.Rev. 371, 383–84 & n. 65 (1974).

**25.** Some cases have suggested the availability as an alternative measure of damages of a modified rescissionary measure, consisting of the difference between the price the defrauded party paid and the price at the time he learned or should have learned the true state of affairs. The theory of this measure is to restore the plaintiff to the position where he would have been had he not been fraudulently induced to trade. See, e. g., *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 104–06 (10th Cir.), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971). The soundness of this measure has been vigorously disputed in the case of open market trading. *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1341–44 (9th Cir. 1976) (Sneed, J., concurring). While the district court cited to *Mitchell*, its opinion makes clear that it was applying the out–of–pocket measure of damages. Since the district court did not apply this modified rescissionary measure, we need not pass on it here.

rare face–to–face transactions, however, uninformed traders on an open, impersonal market are not induced by representations on the part of the tipper or tippee to buy or sell. Usually they are wholly unacquainted with and uninfluenced by the tippee's misconduct. They trade independently and voluntarily but without the benefit of information known to the trading tippee.

In determining what is the appropriate measure of damages to be awarded to the outside uninformed investor as the result of tippee–trading through use of information that is not equally available to all investors is must be remembered that investors who trade in a stock on the open market have no absolute right to know inside information.[26] They are, however, entitled to an honest market in which those with whom they trade have no confidential corporate information. See *SEC v. Texas Gulf Sulphur Co., supra,* 401 F.2d at 848, 851–02.

"The primary object of the exchange is to afford facilities for trading in securities under the safest and fairest conditions attainable. In order that parties may trade on even terms they should have, as far as practicable, the same opportunities for knowledge in regard to the subject matter of the trade." H.R.Rep.No.1383, 73d Cong., 2d Sess. 12 (1934).

It is the combination of the tip and the tippee's trading that poses the evil against which the open market investor must be protected. 2 Bromberg, Securities Law: Fraud § 7.5(3)(b), at 190.9 (1979); Cary, *Insider Trading in Stocks,* 21 Bus.Law 1009 (1966). The reason for the "disclose or abstain" rule is the unfairness in permitting an insider to trade for his own account on the basis of material inside information not available to others. The tipping of material information is a violation of the fiduciary's duty but no injury occurs until the information is used by the tippee. The entry into the market of a tippee with superior knowledge poses the threat that if he trades on the basis of the inside information he may profit at the expense of investors who are disadvantaged by lack of the inside information. For this both the tipper and the tippee are liable. See *SEC v. Texas Gulf Sulphur Co.,* 312 F.Supp. 77, 95 (S.D.N.Y. 1970), *affd.,* 446 F.2d 1301, 1308 (2d Cir. 1971). If the insider chooses not to trade, on the other hand, no injury may be claimed by the outside investor, since the public has no right to the undisclosed information.

Recognizing the foregoing, we in *Shapiro* suggested that the district court must be accorded flexibility in assessing damages, after considering

"the extent of the selling defendants' trading in Douglas stock, whether such trading effectively impaired the integrity of the market, . . . what profits or other benefits were realized by defendants [and] what expenses were incurred and what losses were sustained by plaintiffs. . . . Moreover, we do not foreclose the possibility that an analysis by the district court of the nature and character of the Rule 10b–5 violations committed may require limiting the extent of liability imposed on either class of defendants." 495 F.2d at 242.

We thus gave heed to the guidance provided by the Supreme Court in *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972), to the effect that "Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.' *Id.* [*SEC v. Capital Gains Research Bureau,* 375 U.S. 180], at 195 [84 S.Ct. 275 at 284, 11 L.Ed.2d 237 (1963)]. This was recently said once again in *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12

---

**26.** *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1289 (2d Cir. 1973). Indeed, the tipper will often lack the authority to make public disclosure, which is a matter for the business judgment of the corporation. See *SEC v. Texas Gulf Sulphur Co., supra,* 401 F.2d at 850 n. 12; *Finan-* *cial Industrial Fund, Inc. v. McDonnell Douglas Corp.,* 474 F.2d 514, 518 (10th Cir.), *cert. denied,* 414 U.S. 874, 94 S.Ct. 155, 38 L.Ed.2d 114 (1973); VI Loss, *Securities Regulation* 3590 (Supp.1969).

[92 S.Ct. 165, 168, 30 L.Ed.2d 128] (1971)." See also *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 386, 391, 90 S.Ct. 616, 622, 625, 24 L.Ed.2d 593 (1970) (1934 Act does not "circumscribe the courts' power to grant appropriate remedies").

Within the flexible framework thus authorized for determining what amounts should be recoverable by the uninformed trader from the tipper and tippee trader, several measures are possible. First, there is the traditional out–of–pocket measure used by the district court in this case. For several reasons this measure appears to be inappropriate. In the first place, as we have noted, it is directed toward compensating a person for losses directly traceable to the defendant's fraud upon him. No such fraud or inducement may be attributed to a tipper or tippee trading on an impersonal market. Aside from this the measure poses serious proof problems that may often be insurmountable in a tippee–trading case. The "value" of the stock traded during the period of nondisclosure of the tipped information (i. e., the price at which the market would have valued the stock if there had been a disclosure) is hypothetical. Expert testimony regarding that "value" may, as the district court found in the present case, be entirely speculative. This has led some courts to conclude that the drop in price of the stock after actual disclosure and after allowing a period of time to elapse for the market to absorb the news may sometimes approximate the drop which would have occurred earlier had the tip been disclosed. See *Harris v. American Investment Company*, 523 F.2d 220, 227 (8th Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976). The court below adopted this approach of using post–public disclosure market price as *nunc pro tunc* evidence of the "value" of the stock during the period of non–disclosure.

Whatever may be the reasonableness of the *nunc pro tunc* "value" method of calculating damages in other contexts, it has serious vulnerabilities here. It rests on the

fundamental assumptions (1) that the tipped information is substantially the same as that later disclosed publicly, and (2) that one can determine how the market would have reacted to the public release of the tipped information at an earlier time by its reaction to that information at a later, proximate time. This theory depends on the parity of the "tip" and the "disclosure." When they differ, the basis of the damage calculation evaporates. One could not reasonably estimate how the public would have reacted to the news that the Titanic was near an iceberg from how it reacted to news that the ship had struck an iceberg and sunk. In the present case, the July 10 tip that preliminary earnings would be released in a week is not comparable to the later release of the estimated earnings figures on July 18. Nor was the July 17 tipped information that there was a good possibility that earnings would be down comparable to the next day's release of the estimated earnings figures.

An equally compelling reason for rejecting the theory is its potential for imposition of Draconian, exorbitant damages, out of all proportion to the wrong committed, lining the pockets of all interim investors and their counsel at the expense of innocent corporate stockholders. Logic would compel application of the theory to a case where a tippee sells only 10 shares of a heavily traded stock (e. g., IBM), which then drops substantially when the tipped information is publicly disclosed. To hold the tipper and tippee liable for the losses suffered by every open market buyer of the stock as a result of the later decline in value of the stock after the news became public would be grossly unfair. While the securities laws do occasionally allow for potentially ruinous recovery,[27] we will not readily adopt a measure mandating "large judgments, payable in the last instance by innocent investors [here, Liggett shareholders], for the benefit of speculators and their lawyers," *SEC v. Texas Gulf Sulphur Co., supra*, 401 F.2d at 867 (Friendly, J., concur-

---

27. See, e. g., § 11 of the Securities Act of 1933, 15 U.S.C. § 77k, and §§ 9(e) and 18 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78i(e), 78r.

ring); cf. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739–40, 95 S.Ct. 1917, 1927, 44 L.Ed.2d 539 (1975), unless the statute so requires.

An alternative measure would be to permit recovery of damages caused by erosion of the market price of the security that is traceable to the tippee's wrongful trading, i. e., to compensate the uninformed investor for the loss in market value that he suffered as a direct result of the tippee's conduct. Under this measure an innocent trader who bought Liggett shares at or after a tippee sold on the basis of inside information would recover any decline in value of his shares caused by the tippee's trading. Assuming the impact of the tippee's trading on the market is measurable, this approach has the advantage of limiting the plaintiffs to the amount of damage actually caused in fact by the defendant's wrongdoing and avoiding windfall recoveries by investors at the expense of stockholders other than the tippee trader, which could happen in the present action against Liggett. The rationale is that if the market price is not affected by the tippee's trading, the uninformed investor is in the same position as he would have been had the insider abstained from trading. In such event the equilibrium of the market has not been disturbed and the outside investor has not been harmed by the informational imbalance. Only where the market has been contaminated by the wrongful conduct would damages be recoverable.

This causation–in–fact approach has some disadvantages. It allows no recovery for the tippee's violation of his duty to disclose the inside information before trading. Had he fulfilled this duty, others, including holders of the stock, could then have traded on an equal informational basis. Another disadvantage of such a meas-ure lies in the difficult of not impossible burden it would impose on the uninformed trader of proving the time when and extent to which the integrity of the market was affected by the tippee's conduct.[28] In some cases, such as *Mitchell, supra* and *Shapiro, supra*, the existence of very substantial trading by the tippee, coupled with a sharp change in market price over a short period, would provide the basis for measuring a market price movement attributable to the wrongful trading. On the other hand, in a case where there was only a modest amount of tippee trading in a heavy–volume market in the stock, accompanied by other unrelated factors affecting the market price, it would be impossible as a practical matter to isolate such rise or decline in market price, if any, as was caused by the tippee's wrongful conduct. Moreover, even assuming market erosion caused by this trading to be provable and that the uninformed investor could show that it continued after his purchase, there remains the question of whether the plaintiff would not be precluded from recovery on the ground that any post–purchase decline in market price attributable to the tippee's trading would not be injury to him as a purchaser, i. e., "in connection with the purchase and sale of securities," but injury to him as a stockholder due to a breach of fiduciary duty by the company's officers, which is not actionable under § 10(b) of the 1934 Act or Rule 10b–5 promulgated thereunder. *Blue Chips Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). For these reasons, we reject this strict direct market–repercussion theory of damages.

---

**28.** Although the approach that damages cannot be recovered unless causally connected with the trading on inside information has been recognized, it has also been observed that such connection is difficult to establish. *Fridrich v. Bradford*, 542 F.2d 307, 320 n. 27 (1976), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 769 (1977). Cf. Painter, *Inside Information: Growing Pains for the Development of Federal* *Corporation Law Under Rule 10b–5*, 65 Colum. L.Rev. 1361, 1370 (1965); Note, *Insiders' Liability Under Rule 10b-5 for the Illegal Purchase of Actively Traded Securities*, 78 Yale L.J. 864, 872–73 (1969); Note, *Civil Liability Under Section 10B and Rule 10b–5: A Suggestion for Replacing the Doctrine of Privity*, 74 Yale L.J. 658, 675–76, 679 (1965).

A third alternative is (1) to allow any uninformed investor, where a reasonable investor would either have delayed his purchase or not purchased at all if he had had the benefit of the tipped information, to recover any post–purchase decline in market value of his shares up to a reasonable time after he learns of the tipped information or after there is a public disclosure of it but (2) limit his recovery to the amount gained by the tippee as a result of his selling at the earlier date rather than delaying his sale until the parties could trade on an equal informational basis. Under this measure if the tippee sold 5,000 shares at $50 per share on the basis of inside information and the stock thereafter declined to $40 per share within a reasonable time after public disclosure, an uninformed purchaser, buying shares during the interim (e. g., at $45 per share) would recover the difference between his purchase price and the amount at which he could have sold the shares on an equal informational basis (i. e., the market price within a reasonable time after public disclosure of the tip), subject to a limit of $50,000, which is the amount gained by the tippee as a result of his trading on the inside information rather than on an equal basis. Should the intervening buyers, because of the volume and price of their purchases, claim more than the tippee's gain, their recovery (limited to that gain) would be shared *pro rata*.

This third alternative, which may be described as the disgorgement measure, has in substance been recommended by the American Law Institute in its 1978 Proposed Draft of a Federal Securities Code, §§ 1603, 1703(b), 1708(b), 1711(j). It offers several advantages. To the extent that it makes the tipper and tippees liable up to the amount gained by their misconduct, it should deter tipping of inside information and tippee–trading. On the other hand, by limiting the total recovery to the tippee's gain, the measure bars windfall recoveries of exorbitant amounts bearing no relation to the seriousness of the misconduct. It also avoids the extraordinary difficulties faced in trying to prove traditional out-of-pocket damages based on the true "value" of the shares purchased or damages claimed by reason of market erosion attributable to tippee trading. A plaintiff would simply be required to prove (1) the time, amount, and price per share of his purchase, (2) that a reasonable investor would not have paid as high a price or made the purchase at all if he had had the information in the tippee's possession, and (3) the price to which the security had declined by the time he learned the tipped information or at a reasonable time after it became public, whichever event first occurred. He would then have a claim and, up to the limits of the tippee's gain, could recover the decline in market value of his shares before the information became public or known to him. In most cases the damages recoverable under the disgorgement measure would be roughly commensurate to the actual harm caused by the tippee's wrongful conduct. In a case where the tippee sold only a few shares, for instance, the likelihood of his conduct causing any substantial injury to intervening investors buying without benefit of his confidential information would be small. If, on the other hand, the tippee sold large amounts of stock, realizing substantial profits, the likelihood of injury to intervening uninformed purchasers would be greater and the amount of potential recovery thereby proportionately enlarged.

We recognize that there cannot be any perfect measure of damages caused by tippee· trading. The disgorgement measure, like others we have described, does have some disadvantages. It modifies the principle that ordinarily gain to the wrongdoer should not be a prerequisite to liability for violation of Rule 10b–5. See *Myzel v. Fields*, 386 F.2d 718, 750 (8th Cir. 1967); *Fischer v. Kletz*, 266 F.Supp. 180, 183 (S.D. N.Y.1967); Comment, *Insiders' Liability Under Rule 10b ·5 for the Illegal Purchase*, 78 Yale L.J. 864, 876 (1969). It partially duplicates disgorgement remedies available in proceedings by the SEC or others. Under some market conditions such as where the market price is depressed by wholly unrelated causes, the tippee might be vulnerable to heavy damages, permitting some

plaintiffs to recover undeserved windfalls. In some instances the total claims could exceed the wrongdoer's gain, limiting each claimant to a pro rata share of the gain. In other situations, after deducting the cost of recovery, including attorneys' fees, the remainder might be inadequate to make a class action worthwhile. However, as between the various alternatives we are persuaded, after weighing the pros and cons, that the disgorgement measure, despite some disadvantages, offers the most equitable resolution of the difficult problems created by conflicting interests.

In the present case the sole Rule 10b-5 violation was the tippee–trading of 1,800 Liggett shares on the afternoon of July 17, 1972. Since the actual preliminary Liggett earnings were released publicly at 2:15 P.M. on July 18 and were effectively disseminated in a Wall Street Journal article published on the morning of July 19, the only outside purchasers who might conceivably have been damaged by the insider–trading were those who bought Liggett shares between the afternoon of July 17 and the opening of the market on July 19. Thereafter all purchasers bought on an equal informational footing, and any outside purchaser who bought on July 17 and 18 was able to decide within a reasonable time after the July 18–19 publicity whether to hold or sell his shares in the light of the publicly–released news regarding Liggett's less favorable earnings.

The market price of Liggett stock opened on July 17, 1972, at $55⅝, and remained at substantially the same price on that date, closing at $55¼. By the close of the market on July 18 the price declined to $52½ per share. Applying the disgorgement measure, any member of the plaintiff class who bought Liggett shares during the period from the afternoon of July 17 to the close of the market on July 18 and met the reasonable investor requirement would be entitled to claim a *pro rata* portion of the tippee's gain, based on the difference between their purchase price and the price to which the market price declined within a reasonable time after the morning of July 19. By the close of the market on July 19 the market price had declined to $46⅜ per share. The total recovery thus would be limited to the gain realized by the tippee from the inside information, i. e., 1,800 shares multiplied by approximately $9.35 per share.[29]

The finding of liability based on the July 10, 1972, tip is reversed. The award of damages is also reversed and the case is remanded for a determination of damages recoverable for tippee–trading based on the July 17, 1972, tip, to be measured in accordance with the foregoing.[30] Each party will bear is own costs.

---

**29.** Since, as previously pointed out, the tipped information was not as adverse as the bad news ultimately disclosed, the defendants could plausibly argue that the tippee's gain (and therefore the limit of plaintiffs' recovery) should be only the difference between the price at which he sold and the hypothetical price to which the stock would have declined if the tip had been disclosed. While that approach would make sense if a tippee were held liable for the out–of–pocket losses of all plaintiffs, we think that when only a disgorgement measure of damages is used, a tippee who trades is liable for the entire difference between the price at which he sold and the price the stock reached after the tip became known. By trading on tipped information, the tippee takes the risk that by the time the tip is disclosed the market price may reflect disclosure of information more adverse than the tip and other adverse market conditions.

**30.** The district court acted well within its discretion in awarding prejudgment interest, see *Blau v. Lehman*, 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962), since, under its holding, the plaintiffs were deprived of a principal sum (i. e., damages). *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 50 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642 (1978). While the district court may take into account whether a party unnecessarily prolonged the litigation, we will not on appeal act as referee for intra--party squabbles in determining whether an award of interest is appropriate.