**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

No. 22-1945

---

ADVANCED TRAINING GROUP WORLDWIDE, INC.,

Plaintiff - Appellant,

v.

PRO-ACTIVE TECHNOLOGIES, INC., d/b/a ProActive Technologies, LLC, f/k/a Pro-Active Technologies, L.L.C., d/b/a ProActive Technologies, L.L.C., a Virginia Corporation,

Defendant - Appellee.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Patricia Tolliver Giles, District Judge. (1:19-cv-00505-PTG-WEF)

---

Argued: October 24, 2023                    Decided: December 28, 2023

---

Before NIEMEYER, GREGORY, and HARRIS, Circuit Judges.

---

Affirmed by unpublished opinion. Judge Gregory wrote the opinion, in which Judge Niemeyer and Judge Harris joined.

---

**ARGUED:** Joseph Anthony Whitcomb, WHITCOMB, SELINSKY, PC, Denver, Colorado, for Appellant. Jeffrey Scott Poretz, MILES & STOCKBRIDGE P.C., Tysons Corner, Virginia, for Appellee. **ON BRIEF:** Nathan J.D. Veldhuis, WHITCOMB, SELINSKY, PC, Fredericksburg, Virginia, for Appellant. Joseph M. Rainsbury, Richmond, Virginia, Laura G. Liff, Matthew L. Devendorf, MILES & STOCKBRIDGE P.C., Tysons Corner, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

This case arises from a dispute between two corporations—Pro-Active Technologies ("Pro-Active") and Advanced Training Group Worldwide ("ATG")—who formed a joint venture to bid on a government contract. The district court entered summary judgment for Pro-Active on all but one claim and, following a bench trial, entered judgment for Pro-Active on the remaining claim. ATG appealed. Finding no error, we affirm.

I.

In 2011, the United States government announced that it was starting the acquisition process for the United States Army Special Operations Forces RAPTOR III ("RAPTOR III") contract. Appellee Pro-Active previously bid on the RAPTOR I and RAPTOR II contracts but its proposals had been rejected. To improve the competitiveness of Pro-Active's RAPTOR III bid, Pro-Active's CEO contacted the CEO of ATG, who had special forces experience, about the possibility of Pro-Active and ATG working together for RAPTOR III. ATG's CEO agreed, and the two formed a joint venture, which would be conducted through RAPTOR Training Services ("RTS"), a limited liability company formed for this purpose.

ATG and Pro-Active entered into a Memorandum of Understanding ("MOU") to govern the joint venture until the parties had the opportunity to negotiate a more formal operating agreement. Section 1.0 of the MOU identified the joint venture's goals:

> The goals of the JV [joint venture] are to secure the single award under the SOF RAPTOR III IDIQ; bid on task orders offered under the SOF RAPTOR III IDIQ award, and to perform the services required to support successful execution of awarded task orders in accordance with the terms and conditions

2

governing the JV as outlined herein and as may be further refined and agreed
to in the course of JV operation.

J.A. 2571.

Under Section 5.0, 67% of "membership interests and voting rights" were apportioned to Pro-Active and 33% were apportioned to ATG.  J.A. 2572.  Section 7.0 created a six-member Board with three designees from Pro-Active and three designees from ATG.  J.A. 2572.  Section 7.0 did not specify a voting structure among the Board members.  Finally, Section 20.0 permitted a party to be terminated from the joint venture for "breach of this MOU or the JV governing documents."  J.A. 2581.  From July 2012, when the MOU was signed, until March 2016, the parties operated under the MOU, which became a de facto operating agreement.  Neither Pro-Active nor ATG suggested negotiating a formal operating agreement or attempted to do so during this time.

RTS was awarded the RAPTOR III contract in February of 2014.  The award was an indefinite delivery indefinite quantity ("IDIQ") contract for goods and services relating to the training of special-operations soldiers.  The government had discretion to place task orders, which outlined the parameters of individual assignments to be completed, on the RAPTOR III contract or use another contractor.  The RAPTOR III contract was a "small business set-aside"—it had to be awarded to a small business, and that small business had to perform at least 50% of the labor required under the contract organically, meaning it had to perform the work itself without contracting it out.  Work subcontracted to other businesses did not count toward this requirement, known as the 51% Rule, even if the

3

subcontractor was itself a small business. The 51% Rule was expressly incorporated into the RAPTOR III contract and was never modified.

In October of 2015, government representatives first raised concerns about RTS's compliance with the 51% Rule. At the time, RTS was only completing about 11 percent of the work organically. To address these concerns, ATG and Pro-Active contemplated adding one or more small businesses to the joint venture as "Class B members" in a non-voting capacity. Work performed by Class B members would increase the amount of work performed organically. The companies identified as potential Class B members would not join the joint venture without a formal operating agreement, so ATG and Pro-Active began negotiating an agreement. Pro-Active sent a first draft of the Operating Agreement to ATG on March 21, 2016, but negotiations soon stalled over disagreements concerning Board member voting. ATG insisted that because ATG named half of the Board members, ATG was allotted 50% of the Board's vote, while Pro-Active insisted that the 67/33 voting provision in Section 5.0 also applied to the Board. At around the same time, ATG sent drafts of exclusive sub-contracting agreements to the potential Class B members. Because sub-contracted work did not count toward the 51% Rule, ATG's attempt to sign potential Class B members as exclusive sub-contractors undermined RTS's compliance with the 51% Rule.

Several months later, in October of 2016, a government representative reached out to RTS about moving several large military training exercises to the RAPTOR III contract. However, RTS's receipt of this work was contingent on whether RTS could confirm to the government that it could perform the new work in compliance with the 51% Rule. At the

4

same time, despite renewed negotiations, the parties remained unable to agree on the terms of a formal Operating Agreement. Several days later, Pro-Active sent ATG a letter terminating ATG from the joint venture on the asserted bases that ATG's insistence of 50/50 Board voting was a breach of the MOU and ATG's intransigence was preventing the parties from adding Class B members to the joint venture, which, in turn, was preventing compliance with the 51% Rule.

ATG filed suit against Pro-Active alleging breach of contract, multiple counts of tortious interference with a contract, tortious interference with business expectancy, and unjust enrichment. The parties' discovery disclosures were governed by a stipulated protective order, which defined what information was confidential and limited the ways in which confidential information could be used and to whom it could be disclosed. During discovery, the district court sanctioned ATG's counsel for violation of the parties' stipulated protective order. Following expert discovery, the court struck ATG's damages expert and subsequently granted Pro-Active's motion *in limine* to preclude ATG from introducing evidence relating to claimed damages at trial. As a result, ATG proceeded on a claim for only nominal damages. The district court granted partial summary judgment for Pro-Active, dismissing the tortious interference and unjust enrichment claims but denying summary judgment on the breach of contract claim. Following a two-day bench trial, the district court concluded that ATG had first breached the agreement by insisting on a 50/50 voting split in contravention of Section 5.0 of the MOU, and that ATG thus could not maintain a breach of contract claim against Pro-Active. Accordingly, the district court entered judgment for Pro-Active. ATG appealed.

5

II.

ATG first appeals the district court's verdict on the breach of contract claim. "Following a bench trial, we review a district court's factual findings for clear error and its legal conclusions de novo." *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502 (4th Cir. 2016). "In cases in which a district court's factual findings turn on assessments of witness credibility or the weighing of conflicting evidence during a bench trial, such findings are entitled to even greater deference." *Helton v. AT&T Inc.*, 709 F.3d 343, 350 (4th Cir. 2013).

The MOU provides that Virginia law governs this case. Under Virginia law, the "'party who commits the first breach of contract,' if material, 'is not entitled to enforce the contract' and thereby excuses the nonbreaching party from performance." *VEPCO v. Bransen Energy, Inc.*, 850 F.3d 645, 655 (4th Cir. 2017) (quoting *Horton v. Horton*, 487 S.E.2d 200, 203–04 (Va. 1997)). In other words, if ATG materially breached the MOU before Pro-Active unilaterally terminated ATG from the joint venture, ATG's breach of contract claim fails because ATG was the first to breach. *See id.* "The type of evidence required to establish a material breach of contract will vary depending on the facts surrounding a particular contract," but material breach is proven "when the evidence establishes that the breach was so central to the parties' agreement that [the breach] defeated an essential purpose of the contract." *Horton v. Horton*, 487 S.E.2d 200, 204 (Va. 1997).

The essential purpose of the contract, as established in Section 1.0 of the MOU, was to secure the RAPTOR III contract and carry out task orders offered by the government under that contract. Accordingly, under the agreement, each party had an obligation to

6

conduct itself in a way that was not antithetical to the pursuit of that purpose. If ATG's course of conduct undermined the joint venture's ability to pursue this stated goal, that conduct "defeats the essential purpose of" the MOU, and thus amounts to a material breach. The district court recognized that this is the proper legal standard under which to analyze the parties' conduct, and so did not err as to the legal conclusions underlying its verdict.

Whether ATG's course of conduct undermined this essential purpose is a factual finding that we review for clear error. The district court found that the government conditioned a large award of task orders on RTS's compliance with the 51% Rule. J.A. 4042, 4045. To comply with this requirement, RTS had to add Class B members to the joint venture. J.A. 4046. If RTS could not confirm to the government that it could comply with the 51% Rule, task orders would be steered away from RTS and given to other companies. J.A. 4055. Therefore, if the parties could not reach agreement as to the terms of the Operating Agreement so as to add Class B members, RTS would lose a substantial portion of its work under the RAPTOR III contract, defeating the purpose of the joint venture. *Id.* ATG's insistence on per capita voting for Board members prevented agreement on the Operating Agreement, which prevented addition of Class B members, which, in turn, defeated an essential purpose of the contract such that ATG's conduct was a material breach. J.A. 4057.

These factual findings are all supported by citations to the record and accurately reflect the evidence presented therein. Though there is conflicting evidence in the record, we must credit the district court's weighing of the evidence, and conflicting evidence alone is not a basis for reversal. *See TFWS, Inc. v. Franchot*, 572 F.3d 186, 196 (4th Cir. 2009)

7

("[I]f the district court's account of the evidence is plausible in light of the record in its entirety, we will not reverse the district court's finding simply because we have become convinced that we would have decided the question of fact differently." (internal quotation omitted)).  Further, the district court did not base its conclusion that ATG prevented the addition of Class B members on ATG's refusal to sign the Operating Agreement alone. The district court also pointed to ATG's efforts to enter into exclusive subcontracting agreements with the potential Class B members.  Under these exclusive agreements, the potential Class B members could only have performed work subcontracted through ATG, which would have prevented them from becoming Class B members, such that RTS would have remained unable to comply with the 51% Rule even if a new Operating Agreement had been signed.  J.A. 4057.  Because the district court's determination that this course of conduct prevented RTS from being able to pursue its stated goal was not clearly erroneous, we affirm the district court's verdict.[1]

ATG makes much of the fact that negotiating the terms of a new agreement does not constitute a breach.  But any course of conduct can constitute a breach if it has the effect of defeating an essential purpose of the contract.  *See Breach*, Black's Law Dictionary (11th Ed. 2019) (defining a breach as a violation of an obligation or agreement "whether by neglect, refusal, resistance, or inaction").  While negotiation, no matter how vigorous or discordant, cannot constitute a breach standing alone, when placed in the

---

[1] Because ATG failed to establish Pro-Active's liability on its breach of contract claim, we need not address any of the discovery rulings relating to evidence of damages that ATG additionally challenges.  *See Herman v. Legent Corp.*, No. 94-1445, 1995 WL 115879, at *11 n.25 (4th Cir. 1995).

context of the facts of this case, ATG's insistence on per capita voting was part of the course of conduct that irredeemably frustrated the purpose of the agreement. Even though the negotiations, alone, were not a breach, they contributed to ATG's breach because they resulted in RTS being unable to add Class B members, which prevented RTS from receiving and carrying out task orders in accordance with the joint venture's stated purpose.

## III.

ATG also challenges the district court's grant of summary judgment on its tortious interference claims. ATG alleged below that Pro-Active interfered with ATG's contracts with third-party entities by encouraging those entities to become Class B members of the joint venture. ATG also alleged that Pro-Active tortiously interfered with ATG's business expectancy in receiving future task orders. "We review a district court's grant of summary judgment de novo." *Guthrie v. PHH Mortg. Corp.*, 79 F.4th 328, 342 (4th Cir. 2023).

Under Virginia law, a prima facie case of tortious interference with contract requires the plaintiff to prove:

(1) the existence of a valid contractual relationship or business expectancy;

(2) knowledge of the relationship or expectancy on the part of the interferor;

(3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and

(4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985). The district court correctly concluded that ATG failed to meet its burden of establishing the third element, because ATG had not shown that any of the third-party entities breached or terminated their contracts with ATG.

9

In addition to the four elements required for a tortious interference with contract, tortious interference with business expectancy requires interference by "improper means or methods." *Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 688 (Va. 2012). "Improper methods or means generally involve violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, breach of a fiduciary relationship, violation of an established standard of a trade or profession, unethical conduct, sharp dealing, overreaching or unfair competition." *Id.*

Assuming, without deciding, that ATG can establish the first four elements of a tortious interference with business expectancy claim, summary judgment was proper because ATG's claim fails on the "improper means or methods" element. ATG has not pointed to any improper conduct by Pro-Active. ATG and Pro-Active agreed to work toward adding Class B members to the joint venture. ATG does not dispute this, but only contends that it was hotly disputed *which* entities to add. Even though ATG and Pro-Active had not yet agreed on which entities to add, Pro-Active's conduct toward the agreed-on end of adding Class B members, even if overhasty, was not an "improper means or method" as contemplated under Virginia law. *See Preferred Sys. Sols.*, 732 S.E.2d at 688. Accordingly, we affirm the district court's grant of summary judgment on all tortious interference claims.

IV.

ATG also appeals the district court's denial of leave to amend the complaint, filed in January 2020, after the close of discovery and after Pro-Active had filed its motion for

10

summary judgment.  The district court denied leave to amend on four grounds: (1) because of the advanced stage of litigation, granting leave to amend would be "extremely prejudicial to defendant"; (2) ATG had improperly delayed filing its motion to amend; (3) the motion to amend was a bad faith attempt to disqualify Pro-Active's counsel; and (4) the motion was futile.

We review a denial of leave to amend the complaint for an abuse of discretion. *Glaser v. Enzo Biochem, Inc.*, 464 F.3d 474, 476 (4th Cir. 2006).  Though the district court here justified its denial of the motion to amend on four separate grounds, only one properly supported reason is required for the denial to be within the district court's discretion.  *See Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986) ("[L]eave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, *or* the amendment would be futile." (emphasis added)).  The district court's reliance on the fact that permitting amendment at this advanced stage of litigation would prejudice Pro-Active satisfies this requirement.  We have previously stated that a district court does not abuse its discretion in denying leave to amend when the amendment would add a new legal theory to the case after the close of discovery.  *See Davison v. Randall*, 912 F.3d 666, 690 (4th Cir. 2019); *Equal Rts. Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603–04 (4th Cir. 2010).  Accordingly, we need not address the remaining grounds offered by the district court, *see Johnson*, 785 F.2d at 509, and we affirm the district court's denial of leave to amend.

V.

Finally, ATG appeals the district court's sanctions order awarding Pro-Active attorney's fees for prosecuting its motion to enforce the Protective Order.[2] "We review a district court's issuance of sanctions for failure to comply with a discovery order for an abuse of discretion." *Bizprolink, LLC v. Am. Online, Inc.*, 140 F. App'x 459, 461–62 (4th Cir. 2005). A district court's finding that a party "deliberately disregarded [a] pre-trial order is a factual finding of fault" that "can be overturned by this court only if clearly erroneous." *Rabb v. Amatex Corp.*, 769 F.2d 996, 1000 (4th Cir. 1985).

The magistrate judge found that ATG violated the pre-trial order. This finding is based on the fact that a spreadsheet presented by ATG to Pro-Active during settlement talks included information that could only have been derived from documents designated OCEO ("Outside Counsel's Eyes Only"). Though ATG argued that the information was publicly available, Pro-Active disagreed, arguing that, though more general information is publicly available, the specific details in the chart were not. The magistrate judge agreed with Pro-Active. This factual finding, which the district court affirmed, is not clearly erroneous.

---

[2] ATG did not present any arguments supporting its position in its Opening Brief. Rather, it incorporated by reference the arguments made with respect to the same issue in other briefing. The practice of incorporating documents by reference "at best betrays sloth and at worst represents an attempt to evade Rule 32(a)(7)'s limitations on the length of briefs." 16AA Fed. Prac. & Proc. Juris. § 3974 (5th ed.). "[C]ourts have stated that arguments incorporated by reference need not be considered on appeal." *United States v. Bales*, 813 F.2d 1289, 1297 (4th Cir. 1987); *see also Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 396 n.6 (4th Cir. 1994). However, because ATG's challenge to the sanctions order fails even if it were properly presented, we need not determine whether ATG failed to preserve these arguments.

The magistrate judge imposed two sanctions: it ordered ATG to bear the costs Pro-Active had incurred in prosecuting the motion and limited ATG's ability to use the information at trial by requiring that ATG introduce the evidence either through Pro-Active's witnesses or ATG's expert witnesses, but not through ATG's lay witnesses. Neither is an abuse of discretion, because both sanctions ordered by the court are expressly contemplated by Federal Rule of Civil Procedure 37—indeed, one is required.  Fed. R. Civ. P. 37(b)(2)(A)(ii), 37(b)(2)(C).  Accordingly, the district court's imposition of sanctions was not an abuse of discretion.

## VI.

In sum, we affirm the district court's verdict on the breach of contract claim, affirm the district court's grant of summary judgment on the tortious interference claims, and affirm the district court's various orders rendered during discovery and leading up to trial.

*AFFIRMED*